IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL KARANICOLAS, | ) | CASE NO. 1:17-CV-1567 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Michael Karanicolas ("Karanicolas") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 15.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

Karanicolas filed his application for DIB in October 2013, alleging a disability onset date of July 26, 2013. Tr. 91, 255. He alleged disability based on the following: neck fusion surgery and neck injury. Tr. 258. After denials by the state agency initially (Tr. 147) and on reconsideration (Tr. 157), Karanicolas requested an administrative hearing (Tr. 166). A hearing was held before Administrative Law Judge ("ALJ") Peter Beekman on December 2, 2015. Tr. 106-137. In his March 10, 2016, decision (Tr. 91-101), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Karanicolas can perform, i.e. he is not disabled. Tr. 100. Karanicolas requested review of the ALJ's decision by the Appeals

Council (Tr. 218) and, on May 23, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Karanicolas was born in 1966 and was 47 years old on the date his application was filed. Tr. 255. He completed eleventh grade and previously worked as a warehouse worker lead person, electrician's helper, sales rep delivery driver and carpet cleaner. Tr. 110, 131.

### B. Relevant Medical Evidence

In February 2013, Karanicolas was involved in a car accident. Tr. 110, 328. He went to the emergency room where he was prescribed medications and given a physician referral. Tr. 328. Shortly thereafter, he began experiencing neck, mid-back, and left shoulder pain. Tr. 328. On February 26, he had an x-ray of his left shoulder, which showed mild degenerative changes involving his left acromioclavicular joint, Tr. 365, and an x-ray of his cervical spine, which showed mild disk space narrowing at the C4-C5 and C6-C7 levels and mild degenerative changes, Tr. 367.

On May 21, 2013, Karanicolas saw chiropractor John R. Fortuna, D.C., at Parmatown Spinal and Rehabilitation Center. Tr. 328. Karanicolas explained that he had "beg[u]n some therapies" per his physician but that the therapies were "too much" and were causing him increased pain and discomfort. Tr. 328. Fortuna stated that Karanicolas had completed a "neck disability index form" and scored 20/50, which correlates to 40% disability with normal performance of activities of daily living ("ADLs") and an Oswestry low back pain scale and

scored 23/50, which correlates to 46% disability with normal performance of ADLs.[1] Tr. 328.
Upon exam, Karanicolas' cervical spine range of motion was 40 degrees of flexion, 34 degrees of extension, and 36 degrees of left and right rotation. Tr. 330. Fortuna diagnosed Karanicolas with cervical, thoracic and lumbar strains and a right shoulder strain and recommended further diagnostics and treatment. Tr. 330.

On May 24, 2013, Karanicolas had an MRI of his cervical spine, which showed disc bulging at C3-C4, disc herniation at C4-C5 and C5-6, and straightening of the normal cervical lordosis. Tr. 363-364.

On July 1, 2013, Karanicolas saw surgeon Mark Grubb, M.D., complaining of neck and upper extremity pain, right side greater than left, and tingling, numbness and weakness, particularly in his right upper extremity. Tr. 317. Upon exam, he had a diminished range of motion in his neck, particularly to the right; normal range of motion in his shoulder; motor testing was intact in his elbows, wrists, and fingers; distraction was "helpful"; and he had some diminished sensation in his right hand. Tr. 316. Dr. Grubb provided Karanicolas with some treatment options and Karanicolas elected to have surgery. Tr. 316.

An EMG and nerve conduction velocity study dated July 18 was suggestive of cervical radiculitis best localized at the C5 nerve root most prevalent on the right and right median upper extremity peripheral neuropathy. Tr. 362.

On July 26, 2013, Dr. Grubb performed fusion surgery on Karanicolas at C4-5 and C5-6. Tr. 306-307. On September 3, 2013, Karanicolas saw Dr. Grubb and reported that he was much

---

[1] These disability indexes are calculated based on the patient's subjective pain levels. See, e.g., https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2647244/ (explaining that the Oswestry Disability Index is a self-administered questionnaire where the patients score their pain on a 0-5 scale).

better.  Tr. 314.  Dr. Grubb had x-rays taken, was satisfied with them, and recommended that Karanicolas begin physical therapy and conditioning and increase his activity.  Tr. 314.

On September 6, Karanicolas saw Fortuna and stated that his surgery was "successful and he has noticed a highly marked reduction in the paresthesia and numbness he was previously experiencing in the upper extremities."  Tr. 341.  He began physiotherapy and electric muscle stimulation.  Tr. 341.  On September 9, Karanicolas reported that he was "definitely feeling better" after his surgery with less pain and minimal symptoms radiating into his upper extremities.  Tr. 340.  Fortuna provided manipulations, physiotherapy and stretches and stated that Karanicolas would transition to an "active rehab program, especially since he is experiencing a lot of weakness in both upper extremities."  Tr. 340.  On September 13, Karanicolas reported "ongoing pain" in his mid- and lower-back, but he was slowly improving and the paresthesia in his upper extremities was diminished.  Tr. 339.  Fortuna noted that Karanicolas had "recently" had an EMG/nerve conduction velocity test of his arms which showed radiculitis at the C5 nerve root.  Tr. 339.

On September 16, 2013, Karanicolas reported to Fortuna that his neck pain was "still significant" and he still had a restricted range of motion in his neck after his fusion surgery.  Tr. 338.  He was still having a lot of weakness in his upper extremities and pain in his lower back, but his main area of concern was his neck.  Tr. 338.  On September 23, Karanicolas reported that he had some soreness radiating into both shoulders.  Tr. 336.  On September 25, he reported neck pain and "a lot of weakness in both upper extremities."  Tr. 335.  On September 27, he complained of ongoing post-operative residual soreness and discomfort and Fortuna recommended he continue with treatments.  Tr. 334.  On September 30, Karanicolas' neck soreness was radiating into his upper extremities.  Tr. 333.  On October 2, he reported that he

was "still very concerned about returning to work this month." Tr. 332. Fortuna opined that it was doubtful that he will be able to return to his physically demanding job within two weeks, his scheduled return to work date. Tr. 332.

On October 15, Karanicolas saw Dr. Grubb. Tr. 313. Dr. Grubb's treatment note states that Karanicolas was doing well and that he would like to return to work. Tr. 313. Upon exam, his incision looked good and his strength "remains intact." Tr. 313. X-rays were taken. Tr. 313. They showed postoperative changes (Tr. 318) and Dr. Grubb remarked that the interbody graft looked good (Tr. 313). Dr. Grubb stated that Karanicolas had "done well" and released him to work beginning the following week. Tr. 313.

On November 21, 2013, Karanicolas returned to Dr. Grubb complaining of difficulty swallowing and breathing. Tr. 374. He also reported some neck stiffness. Tr. 374. Upon exam, he had intact, normal strength. Tr. 374. Dr. Grubb suggested he see an ear, nose, throat doctor. Tr. 374.

On June 5, 2014, Karanicolas returned to Dr. Grubb. Tr. 455. He revealed that he was unable to work, his disability had been denied, and he had shortness of breath. Tr. 455. Dr. Grubb stated that Karanicolas had a "number of complaints," his symptoms were "infrequent," and they occurred "when he goes to work." Tr. 455. Upon exam, he had good head/neck alignment, good motion, and intact strength. Tr. 455. X-rays were taken and showed additional consolidation in the fusion at C4-C5 and C5-C6. Tr. 455. Dr. Grubb expressed concern for Karanicolas' overall conditioning and recommended he undergo an evaluation for his cardiorespiratory health and a sleep study. Tr. 455.

On September 18, 2014, Karanicolas had x-rays of his cervical spine showing postsurgical changes at C4-5 and C5-6 levels; the height of the vertebral bodies and disc spaces were maintained. Tr. 394.

At his sixth of twelve visits with physical therapy on October 20, 2014, Karanicolas reported a painful, reduced cervical range of motion. Tr. 398-399. He reported no change in the intensity of his pain since starting physical therapy. Tr. 399. That day his pain was 8/10 and constant. Tr. 397. His neck disability index score was 62% disability. Tr. 398. He had difficulty washing his hair, self-care, and driving due to pain. Tr. 398. The therapist educated Karanicolas on breathing techniques and stretching to promote relaxation. Tr. 399.

On July 14, 2015, Karanicolas visited his pain management clinic and reported "significant relief of bilateral hand symptoms when he is wearing his wrist splints in bed." Tr. 457. When he did not wear the splints he had severe pain. Tr. 457. He had not had an EMG done. Tr. 457. He was taking Cymbalta and it was helping; he reported that when he missed a dose he noticed that his pain was significantly worse. Tr. 458. Physical therapy helped when he was at the physical therapist but did not seem to help at home. Tr. 458. Upon exam, he had full motor strength in all extremities, normal reflexes and intact sensation. Tr. 460. It was recommended that he follow up with an EMG for carpal tunnel syndrome, physical therapy was reordered, and an increase in Cymbalta and gabapentin would be considered, noting that Karanicolas had just restarted these medications. Tr. 460.

The record also shows that Karanicolas complained of shortness of breath, joint pain, and arthritis. See, e.g., Tr. 389, 472.

**C. Medical Opinion Evidence**

    1**. Consultative Examiner**

On December 10, 2013, Karanicolas saw Kimberly Togliatti-Trickett, M.D., for a consultative examination. Tr. 376-383. Karanicolas stated that he was unable to work because of neck pain and numbness and tingling in his neck down into his shoulders. Tr. 380. His hands become numb and he will drop things at times and he needed others to help him lift things. Tr. 381. His symptoms were better when moving and worse when sitting, lying down, and when he continued activity again after having stopped. Tr. 381. He could sit for 30-35 minutes and standing and walking were "ok." Tr. 381. He could lift 10-15 pounds. Tr. 381. He was currently taking no medication. Tr. 381. Upon exam, he had a limited range of motion in his cervical spine with pain, no tenderness to palpation, normal range of motion in his extremities, good spinal alignment and a normal gait. Tr. 382. His hand and wrist joints were normal. Tr. 382. He had full, normal, "5/5" strength in all four extremities, normal sensation and reflexes, and normal hand grasp, manipulation, pinch and fine coordination bilaterally. Tr. 382. He had no muscle spasm or atrophy in any extremity. Tr. 382. Dr. Togliatti-Trickett opined that Karanicolas could stand for at least four to six hours during a workday, noted that he had pain and difficulty sitting in one position, and he could lift and carry objects up to twenty pounds on occasion, without difficulty. Tr. 382. She recommended a light or sedentary job. Tr. 382.

On page one of the manual muscle testing worksheet, Dr. Togliatti-Trickett indicated that Karanicolas had 4/5 upper extremity strength rather than 5/5, as she had stated in her narrative. Tr. 376. In a January 6, 2014, follow-up letter, Dr. Togliatti-Trickett explained this discrepancy, stating that Karanicolas "did not have neurological weakness but limited effort at 4-5/5 due to pain." Tr. 385. She attached a newly completed page one of the manual muscle testing form indicating that Karanicolas had 4-5/5 strength with "limited effort and pain overall." Tr. 386. She concluded, "In summary, he is limited with his overall abilities due to his subjective

7

complaints of pain and general decreased subjective deconditioning and physical limitations."
Tr. 385.

### 2. State Agency Reviewing Physicians

On January 31, 2014, state agency physician Steve McKee, M.D., reviewed Karanicolas' record. Tr. 141-144. Regarding Karanicolas' RFC, Dr. McKee opined that Karanicolas could perform light work (lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk and sit for 6 out of 8 hours), with a few postural limitations. Tr. 143-144.

On April 21, 2014, state agency physician Lynne Torello, M.D., reviewed Karanicolas' file and adopted Dr. McKee's opinions. Tr. 153-154.

### D. Testimonial Evidence

#### 1. Karanicolas' Testimony

Karanicolas was represented by counsel and testified at the administrative hearing. Tr. 108-130. He confirmed that he had stopped working as a result of his car accident, in February 2013; he had neck fusion surgery in July 2013; went back to work in October 2013; and a week or so later was let go because he was unable to perform his job duties of a warehouse worker and manager. Tr. 109-112.

At the hearing, Karanicolas was wearing a wrist brace on his right wrist/hand. Tr. 112. He has a brace for both wrists and was told to wear them all the time because he has carpal tunnel "pretty bad." Tr. 112. He was not wearing the left brace because his left was not hurting like his right. Tr. 112. He developed the carpal tunnel within the last few years; he had had "some kind of electrical shock test" that he "failed [] miserably" and he was "still going through the process with the doctor and medications" and seeing what could be done. Tr. 112. He stated

that it seemed like he was headed towards surgery. Tr. 112. Sometimes he has a lot of problems holding things with his hands. Tr. 112.

Karanicolas' biggest problem currently was his asthma. Tr. 113. He had smoked for 20 years and his asthma is getting worse. Tr. 113. He has inhalers and was also told to lose weight. Tr. 113. On an average day, Karanicolas spends a lot of time in the bathroom—1/3 of the day—because he has irritable bowel syndrome and Crohn's disease. Tr. 113. He takes medication that helps and he has days when he is okay and days when he spends a lot of time in the bathroom. Tr. 113. He was diagnosed with Crohn's about four years prior. Tr. 113. Regarding his average day, if he attempts to go down the flight of stairs in his house to do laundry, "that's like a major malfunction. It takes all day." Tr. 114. Because of his asthma, he feels like he ran a marathon when he goes down the steps. Tr. 114.

Karanicolas stated that weather affects him greatly, especially his neck. Everything hurts more when it is cold or raining. Tr. 118. He has a hard time turning his head after his fusion surgery and can't turn it past his shoulder to the left or the right, like a normal person. Tr. 114. If he tries to push it too far it hurts "really bad and I'll hear like a clicking noise." Tr. 114. He takes naps periodically throughout the day because he doesn't sleep a lot at night. Tr. 114. Since his surgery, he is up during the night because his neck is constantly sore no matter what position he lies in or how he arranges pillows. Tr. 114. When he wakes up, it takes between 10 minutes to an hour to fall back asleep again. Tr. 123. His hands go numb at night because of his carpal tunnel. Tr. 114. He was just diagnosed a few weeks prior to the hearing with arthritis in his knees and they swell. Tr. 114-115.

Every day is different with respect to whether he is more comfortable sitting or walking around. Tr. 115. Generally, he is up and down all day. Tr. 115. This is due to his neck, his

knees, and his asthma. Tr. 115. He also has heel spurs in his feet and, when he walks, his feet and ankles swell and he has to relax and just sit or lie down. Tr. 115. He also avoids going out much because he has vertigo and gets dizzy. Tr. 116. When he is between sitting and standing he does a lot of pacing. Tr. 126. Then he knees start hurting and he sits and then they go numb and get stiff. Tr. 126.

Karanicolas stated that his surgeon told him that he had nerve damage and that after the surgery "it would probably get a little worse." Tr. 117. It's hard for Karanicolas to shave because the area is numb. Tr. 117. His hands shake and he is nervous all the time. Tr. 117. It seems to get worse, but he has good days and bad days. Tr. 117.

Karanicolas testified that he can sit for maybe 30 minutes, stand for maybe 30 minutes, and walk for about five minutes. Tr. 122. Lifting is "an issue," due, in part, to his neck and more due to his breathing. Tr. 122. The amount he can lift "depends the kind of weight we're talking about." Tr. 122. Comfortably, without having issues, he doesn't know how much he could lift, maybe 10 pounds. Tr. 123. He doesn't really attempt to lift anything. Tr. 123.

Since his surgery, the numbness in his hands has gotten worse. Tr. 123-124. With his braces on, he can grab something; "it's just a matter of how long I can actually hold it before I have to let it go." Tr. 124. He has had glasses fall out of his hand because his hand gave way. Tr. 124. He has learned to hold a glass differently. Tr. 124. He doesn't have trouble opening a gallon of milk; "I got to have it." Tr. 124. He does it with his left hand, however, because it's harder to do it with his right. Tr. 124. He usually has someone else open a jar of pickles. Tr. 124. He can pick up a paperclip off the table. Tr. 125. When asked if he could work with his fingers on a frequent basis, Karanicolas responded, "Probably not without stopping all the time." Tr. 125. Typing on a computer is an issue for him and he gets stiff and sore and numb when he

holds a pen or writes. Tr. 125. His braces sometimes help his hands, but sometimes it's a hindrance. Tr. 125. He explained that he needs to let his hand breathe and also its restricts his hand and if he lets it go it feels a little bit better, then worse, then he has to put the braces on. Tr. 125. It's a day-to-day thing. Tr. 125.

Karanicolas stated that after his surgery, he went to physical therapy but that it made him feel worse. Tr. 127. Every time he went the therapist would tell him that he felt tighter than the last time. Tr. 127. Someone at his pain management clinic recommended determining whether he needed additional surgery, but he hasn't spoken to anyone about that. Tr. 127.

The hardest part about dressing, bathing and feeding himself is bathing. Tr. 127-128. His knees make it hard to get in and out of the tub; he can do it, but it takes longer. Tr. 128. Getting dressed takes longer too; he has to sit and pull his leg towards him to put his socks on. Tr. 128. He goes to church "here and there" because it is hard with his sitting and standing to go all the time. Tr. 128. Once in a while he goes to the grocery store, but he doesn't like to go because of all the walking up and down the aisles. Tr. 128. He lives with his friend and her two children and helps out with the cooking and the cleaning when he can. Tr. 128. He has gone to watch the children's sporting events but he doesn't go all the time. Tr. 129. It's hard to sit and to breathe when it's hot or cold. Tr. 129. Driving is difficult because he can't look over his shoulder, so his friend usually drives him where he needs to go. Tr. 130. His neck surgery "somewhat" made his upper extremity limitations go away, but "I still have my issues." Tr. 130.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Brett Salkin testified at the hearing. Tr. 131-136. The ALJ discussed with the VE Karanicolas' past work. Tr. 131-132. The ALJ asked the VE to determine whether a hypothetical individual with Karanicolas' age, education and work

experience could perform any other work if the individual had the following characteristics: can lift 20 pounds occasionally and 10 pounds frequently; can stand/walk for six out of eight hours and sit for six out of eight hours; can occasionally push, pull and foot pedal; can occasionally use ramps or stairs but never ladders, ropes or scaffolds; can constantly balance, stoop, and crouch, frequently kneel, and never crawl; can reach, including overhead, occasionally; can frequently handle, finger and feel; must avoid high concentrations of heat, cold, wetness, humidity, vibration, smoke, fumes, pollutants, and dust; and must entirely avoid dangerous machinery and unprotected heights. Tr. 132-133. The VE answered that such an individual could perform work as an usher (90,000 national jobs, 2,000 Ohio jobs, 500 regional jobs); counter clerk (16,000 national jobs, 400 Ohio jobs, 150 regional jobs); and children's attendant (10,000 national jobs, 300 Ohio jobs, 50 regional jobs). Tr. 133.

The ALJ asked the VE if the jobs he identified would still be available if the individual described above had the following, additional limitation: the individual would need a position change for 10 minutes every hour, i.e., if they were seated they would have to stand for 10 minutes and vice versa. Tr. 133-134. The VE stated that his answer would not change. Tr. 134.

Next, Karanicolas' attorney asked the VE whether a hypothetical individual with the following limitations could perform Karanicolas' past relevant work or any other work: can lift 20 pounds occasionally and 10 pounds frequently; can stand for four out of eight hours and sit for four out of eight hours; must alternate between sitting and standing every 30 minutes; cannot climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs; can occasionally balance but cannot crouch, kneel, stoop or crawl; cannot push or pull; can occasionally reach overhead and forward; must avoid temperature extremes and pulmonary irritants and all workplace hazards, including unprotected heights and dangerous machinery; cannot drive; and

can occasionally handle, finger and feel. Tr. 134-135. The VE answered that there would be no work for such an individual. Tr. 135. Karanicolas' attorney asked the VE if his answer would change if the handling, fingering and feeling limitation were removed and a limitation were added that the individual would have to walk around and stretch for 5-7 minutes when he got up every 30 minutes. Tr. 135. The VE stated that his answer would not change. Tr. 135-136.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

13

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his March 10, 2016, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018. Tr. 93.

2. The claimant has not engaged in substantial gainful activity since July 26, 2013, the alleged onset date. Tr. 93.

3. The claimant has the following severe impairments: peripheral neuropathy; degenerative disc disease status post spinal fusion; asthma; osteoarthritis and degenerative joint disease. Tr. 93.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 94.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally push, pull and foot pedal;

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

14

occasionally use ramps or stairs but never ladders, ropes or scaffolds; constantly balance, stoop, crouch; frequently kneel; never crawl; occasionally reach, including overhead; frequently handle, finger and feel; constant visual capabilities and communication skills; avoid high concentrations of heat, cold, wetness, humidity, vibration, smoke, fumes, pollutants, dust and entirely avoid dangerous machinery and unprotected heights.  Tr. 95.

6. The claimant is unable to perform any past relevant work.  Tr. 100.

7. The claimant was born in 1966 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 100.

8. The claimant has a limited education and is able to communicate in English.  Tr. 100.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 100.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 100.

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 26, 2013, through the date of this decision.  Tr. 101.

## V. Plaintiff's Arguments

Karanicolas argues that the ALJ's RFC determination is not supported by substantial evidence.  Doc. 17, p. 1.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

Karanicolas argues that the ALJ's conclusion that Karanicolas can perform light work is not supported by substantial evidence. Doc. 17, p. 7. He also complains that the evidence supports no more than occasional handling and fingering, rather that frequent as the ALJ found. Doc. 17, p. 8. Aside from recounting certain evidence, Karanicolas does not explain how the ALJ's decision was erroneous. The ALJ detailed Karanicolas' medical history: the radiating symptoms from his neck to his upper extremities after his car accident in 2013; his cervical fusion surgery; initially feeling better with a reduction in upper extremity symptoms; subsequent reports of symptoms in his upper extremities; post-surgical x-rays showing good results and the surgeon opining that Karanicolas had "done well"; the consultative examination showing 4-5/5 manual muscle testing due to limited effort based on complaints of pain and the examiner's opinion that Karanicolas could perform light or sedentary work. Tr. 96-97. The ALJ commented that Karanicolas' treatment was conservative and that in 2015 he had full motor strength, intact sensation and normal reflexes, and that his symptoms improved with wrist splints and medication. Tr. 97, 98. The ALJ recounted Karanicolas' statements that he can perform self-care tasks and perform some chores, although it takes longer; that he can lift 10 pounds comfortably; and that he reported in September 2014 that he was "active at home cleaning." Tr. 96-98. The ALJ relied on the state agency reviewing physicians' opinions that Karanicolas could perform light work and the ALJ's RFC included additional limitations with respect to Karanicolas' upper extremity symptoms (frequently handle, finger and feel). Tr. 98-99.

Karanicolas does not challenge any of the ALJ's findings and merely disagrees with the ALJ's conclusion without articulating a specific challenge. Substantial evidence supports the ALJ's decision.

Karanicolas also argues that the ALJ's credibility analysis was flawed. Doc. 17, p. 8. In support, he cites SSR 16-3p (Doc. 17, p. 9), which was not in effect at the time of the ALJ's decision. *See* 2017 WL 5180307, at \*13 (SSR 16-3p is effective beginning March 28, 2016). Karanicolas states that the ALJ found that Karanicolas can shower, dress and help with laundry but points out that Karanicolas had reported to his physical therapist difficulty washing his hair because of upper extremity weakness. Doc. 17, p. 9 (citing Tr. 410). However, the fact remains that Karanicolas testified that he can shower, dress and help with laundry (Tr. 127-129) and also, as the ALJ observed, he had indicated in September 2014 that he was "active at home cleaning." Tr. 98, 433. Karanicolas complains that the ALJ "failed to acknowledge" his other complaints regarding his upper extremities at the time he had reported being active at home cleaning in September 2014. Doc. 17, p. 10. But the ALJ did consider that Karanicolas had regularly complained of upper extremity symptoms; he also observed that these symptoms improved in 2015 after Karanicolas began taking Cymbalta and wearing wrist splints. Tr. 98.

In sum, Karanicolas does not identify an error that the ALJ committed; instead, he disagrees with the ALJ's decision and wants the Court to reweigh the evidence and find in his favor. This the Court cannot do. *Garner*, 745 F.2d at 387 (A court "may not try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility."). Substantial evidence supports the ALJ's decision and it must, therefore, be affirmed. S*ee Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (so long as there is substantial evidence to support the ALJ's determination, the Commissioner's decision must be affirmed).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

IT IS SO ORDERED.

Dated: June 12, 2018

 */s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge